UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | No. 10-154 |
| DAVID WARREN ET AL. | SECTION I |

## ORDER AND REASONS

Before the Court are the motions[1] to transfer venue filed by defendants, David Warren ("Warren") and Travis McCabe ("McCabe"). The government has filed an opposition.[2] Defendants have each filed a reply and supplemental exhibits.[3] Although unlikely, assuming that prejudice to one defendant would extend to the other provides a simpler analysis and greater protection for defendants' right to an impartial jury. Accordingly, the Court considers the motions together.

In their motions, defendants assert that a transfer of venue is necessary pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure and pursuant to the constitutional standard that the U.S. Supreme Court recently addressed in *Skilling v. United States*, 130 S. Ct. 2896 (2010). For the following reasons, the motions are **DENIED** without prejudice to defendants' right to re-urge their motions following the receipt of juror questionnaires.

---

[1] R. Doc. Nos. 649 & 650.
[2] R. Doc. No. 672.
[3] R. Doc. Nos. 655, 669, 676, 679.

*STANDARD OF LAW*

Due process requires a transfer of venue if "extraordinary local prejudice will prevent a fair trial." *Skilling*, 130 S. Ct. at 2896 (citations and quotations omitted). Rule 21(a) similarly provides:

> Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

**I. Constitutional Standard**

In *Skilling*, the Supreme Court addressed whether media coverage gave rise to a presumption of prejudice that required a venue transfer prior to voir dire and whether voir dire failed to yield an impartial jury. *Id.* at 2912. The first issue is presently before the Court.

The Supreme Court has acknowledged that only an "impossible standard" would require jurors without any "preconceived notion as to the guilt or innocence of an accused." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). In *Irvin*, the Supreme Court affirmed a denial of a venue change motion where slightly more than two-thirds of the 75-person venire admitted that they had heard, seen, or read news coverage of the case. *Id.* at 728. The Supreme Court held that the relevant standard evaluates whether "[a] juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. Nonetheless, there are certain "extreme" cases in which "publicity inflamed the jury pool, pervasively prejudiced the community against the defendant, probatively incriminated him, or exceeded the sensationalism inherent in the crime." *United States v. Wilcox*, 631 F.3d 740, 747, 749 (5th Cir. 2011) (quotation and modification omitted).

The Supreme Court has identified the following factors as relevant to identifying a presumption of prejudice: (1) the size and characteristics of the community in which the crime

occurred; (2) whether media coverage about the defendant contains "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; (3) whether the passage of time has lessened prejudicial media attention; and (4) whether the jury's conduct is inconsistent with a presumption of prejudice. *See Skilling*, 130 S. Ct. at 2915-16.

**II. Rule 21(a) Standard**

McCabe argues that Rule 21(a) requires a lower burden of proof than the constitutional standard.[4] The only legal support he provides comes from footnote 11 in *Skilling*:

> Venue transfer in federal court is governed by Federal Rule of Criminal Procedure 21, which instructs that a "court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."As the language of the Rule suggests, district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect. See *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 245 (1964). Federal courts have invoked the Rule to move certain highly charged cases, for example, the prosecution arising from the bombing of the Alfred P. Murrah Federal Office Building in Oklahoma City. See *United States v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D. Okla. 1996). They have also exercised discretion to deny venue-transfer requests in cases involving substantial pretrial publicity and community impact, for example, the prosecutions resulting from the 1993 World Trade Center bombing, see *United States v. Salameh*, No. S5 93 Cr. 0180 (KTD) (SDNY, Sept. 15, 1993); *United States v. Yousef*, No. S12 93 Cr. 180(KTD) (SDNY, July 18, 1997), aff'd 327 F.3d 56, 155 (C.A.2 2003), and the prosecution of John Walker Lindh, referred to in the press as the American Taliban, see *United States v. Lindh*, 212 F.Supp.2d 541, 549, 551 (E.D. Va.2002). Skilling does not argue, distinct from his due process challenge, that the District Court abused its discretion under Rule 21 by declining to move his trial. We therefore review the District Court's venue-transfer decision only for compliance with the Constitution.[5]

---

[4]R. Doc. No. 649-1, at 3. Warren argues that due process requires a venue transfer in certain cases and describes Rule 21 as "[t]he mechanism for such a transfer of venue." R. Doc. No. 650-1, at 3.
[5]*Skilling*, 130 S. Ct. at 2913 n. 11.

McCabe argues that the law set forth in *Skilling* "does not control generally how district courts should decide pre-trial motions to change venue under Rule 21, and certainly does[n't] dictate how this Court should decide McCabe's motion."[6] McCabe does not identify an alternative approach, however, and he generally relies on *Skilling* throughout his motion.

The Court agrees that *Skilling* footnote 11 suggests Rule 21(a) permits venue transfers that are not constitutionally required, but the cases cited by the Supreme Court do not suggest the rule involves a different baseline standard. *E.g.*, *Lindh*, 212 F. Supp. 2d at 548 (stating that constitutional principles "govern resolution of this motion"); *McVeigh*, 918 F. Supp. at 1469 (characterizing the Fifth and Sixth Amendments as the "foundation for Fed. R. Crim. P. 21(a)"). The Fifth Circuit recently applied *Skilling*'s constitutional test directly to a Rule 21 motion. *Wilcox*, 631 F.3d 740. Accordingly, the Court will apply the substantive constitutional standard, but prospectively, inquiring whether a well-grounded fear of improper prejudice weighs in favor of granting defendants' motions. *See United States v. Marcello*, 280 F. Supp. 510, 513 (E.D. La. 1968), *aff'd*, 423 F.2d 993, 1004 (5th Cir. 1970) (praising Judge Heebe's "well written opinion"); *see also United States v. Mitchell*, 752 F. Supp. 2d 1216, 1219 (D. Utah 2010) (following and quoting *Marcello*, 280 F. Supp. at 513).

The Fifth Circuit recently discussed *Marshall v. United States*, 360 U.S. 310 (1959), which involves a different standard associated with mid-trial publicity, in the context of Rule 21(a). *Wilcox*, 631 F.3d at 748-49. The parties in the above-captioned matter were invited to brief *Marshall*'s applicability to the venue motions.[7] No party contends that the *Marshall* standard applies to pre-trial

---

[6] R. Doc. No. 649-1, at 4.
[7] R. Doc. No. 699.

-4-

publicity in the Fifth Circuit.[8] Rather, defendants argue that the Court should take notice of the risk of mid-trial publicity.[9] The Court will do so, but it will not incorporate the *Marshall* standard directly to the pre-trial publicity evaluation.

### *ANALYSIS*

According to Warren, "there is hardly a soul" in New Orleans who "hasn't formed an opinion . . . that is highly prejudicial to Warren."[10] McCabe similarly argues that "[t]here is a substantial risk that many, if not most, prospective jurors would be unable to impartially judge Officer McCabe" and that "publicity has been so pervasive that it creates a presumption of prejudice."[11] The government responds that both defendants' motions should be denied outright "because the publicity in this case is not of the sort to justify a presumption of prejudice to the venire; and, because if there were any prejudice, that prejudice could be ferreted out during voir dire." The government alternatively requests that the Court "defer ruling on the defendants' motions until after the court has received the juror questionnaires in this case."[12]

"[P]re-trial publicity–even pervasive, adverse publicity–does not inevitably lead to an unfair trial." *Skilling*, 130 S. Ct. at 2916 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)). After considering the factors emphasized in *Skilling* and all other relevant circumstances, the Court concludes that defendants have not demonstrated a well grounded fear that pre-trial publicity has "inflamed the jury pool, pervasively prejudiced the community against the defendant, probatively

---

[8]*See* R. Doc. Nos. 704-706.
[9]R. Doc. Nos. 704, at 4-5; 705, at 5 & n. 1.
[10]R. Doc. No. 650-1, at 13.
[11]R. Doc. No. 649, at 10.
[12]R. Doc. No. 672.

incriminated him, or exceeded the sensationalism inherent in the crime." *Wilcox*, 631 F.3d at 747 (quotation and modification omitted).

**I. Characteristics of the Community**

    **A. Size**

In *Skilling*, the Supreme Court concluded that Houston's population, reflected in its status as the fourth largest city in the United States, suggested that a presumption of prejudice was unwarranted. 130 S. Ct. at 2915. Warren argues that "[t]he New Orleans area is geographically and statistically much smaller than Houston."[13] McCabe does not attempt to argue that the Eastern District of Louisiana's size makes it susceptible to jury prejudice, but instead asserts that "it is the collective experience and perception of the jury pool, not the size of the jury pool, that [is] most relevant" in evaluating defendants' motions.[14]

The government persuasively emphasizes that the Eastern District of Louisiana has a population of approximately 1.5 million,[15] which far exceeds the populations implicated in cases where the Supreme Court has required a venue transfer. In *Skilling*, 130 S. Ct. at 2915, the Supreme Court contrasted *Rideau v. Louisiana*, 373 U.S. 723 (1963), which involved a population of approximately 150,000, with *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), which involved a population exceeding 3 million, and *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044 (1994)

---

[13]R. Doc. No. 650-1, at 4.
[14]R. Doc. No. 649-1, at 7.
[15]R. Doc. No. 672, at 7.

(plurality), which involved a population of 600,000.[16] The size of the Eastern District of Louisiana's population is more comparable to these latter cases and weighs against a transfer.

### B. Other Characteristics

In addition to population, *Skilling* instructs courts to look to a community's diversity and crime rate as additional relevant characteristics. The Eastern District of Louisiana's thirteen parishes encompass a diverse population, weighing against any fear of an impermissibly prejudiced jury pool. With respect to crime rates, in *Skilling* the Supreme Court noted that the potential for prejudice in *Mu'Min*, was "mitigated by the size of the 'metropolitan Washington [D.C.] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year.'" 130 S. Ct. at 2915 (citing 500 U.S. at 429). In contrast, *Irvin*, involved an underlying population of 182,537, and only nine murders had occurred in the previous year. 500 U.S. at 429. The rate of violent crime in the Eastern District of Louisiana is not discussed by the parties.

## II. Media Coverage

### A. Extent of Coverage

Defendants have provided approximately 3,261 pages[17] of media coverage and accompanying commentary, which encompasses this case and *United States v. Bowen*, also referred to as the "Danziger Bridge" case. No. 10-204, 2011 WL 1979949 (E.D. La. May 20, 2011). Most of the coverage comes from the *Times-Picayune* and its companion website, NOLA.com. Warren asserts that seventy-one percent of adults in the Greater New Orleans area read the *Times-*

---

[16]*Skilling* itself involved a population of "4.5 million individuals eligible for jury duty." 130 S. Ct. at 2915. The section of the Clerk of Court's office responsible for jury matters advised the Court that 974,192 individuals were on the active list of registered voters eligible for jury duty as of January 17, 2013. Of that number, 60,000 individuals are randomly drawn to create a master jury wheel.
[17]R. Doc. No. 649, at 3 (providing page total).

*Picayune*.[18] The website he references suggests that the relevant time span for that statistic is April 2011 through March 2012.[19] During that time, the *Times-Picayune* was published daily. Beginning in October 2012, the *Times-Picayune* reduced its publication to three times per week.[20]

Related to the population discussion above, however, there is no evidence regarding the extent to which the *Times-Picayune* and NOLA.com reach jurors who reside within the Eastern District of Louisiana but outside the New Orleans metropolitan area. As Judge Engelhardt observed in *Bowen*:

> [T]he jury pool is not limited to the "greater New Orleans Metropolitan Area." Rather, the jury members who will be chosen to sit for this trial will be selected from thirteen diverse parishes across southeastern Louisiana, from areas as far away as Amite, Bogalusa, Hammond, Slidell, Chalmette, Point-a-la-Hache and the Houma/Thibodaux area, that constitute the Eastern District of Louisiana. Those areas, and others similar, are outside of the scope of metropolitan New Orleans, and, for the most part, have either their own newspapers and/or local electronic media, or lie within the broadcasting area of other localities, such as Baton Rouge. Thus, it is not a foregone conclusion that every potential member of the jury will have been exposed to the "news" items described in the defendants' memorandum, particularly those printed in the New Orleans-based local newspaper.[21]

Information distributed to only some of these parishes does not demonstrate "the pervasiveness or saturation level of prejudicial publicity necessary to invoke" a presumption of prejudice with respect to the entire Eastern District of Louisiana. *Mayola v. Alabama*, 623 F.2d 992, 998 (5th Cir. 1980)

---

[18] R. Doc. No. 650-1, at 5.
[19] NOLA Media Group, http://www.nolamediagroup.com/audience/ (last visited April 10, 2013).
[20] Dave Thier, *For New Orleans, A Daily That's No Longer Daily*, N.Y. TIMES, Sept. 30, 2012, at A17, *available at* http://www.nytimes.com/2012/10/01/us/times-picayune-publishes-last-daily-issue.html?_r=0.
[21] *Bowen*, 2011 WL 1979949, at *2.

McCabe and Warren argue that public comments on news sites should be considered as another cause and indication of community prejudice. Assuming that "hundreds of highly negative comments made online by readers of NOLA.com articles" pertain to this case, there is no evidence that these comments are representative of the hundreds of thousands of individuals who are eligible to serve as jurors in the Eastern District of Louisiana.[22] Even if several hundred members of the jury pool were unable to set aside highly negative opinions, which is a different question than whether they had ever posted a highly negative opinion online, the jury pool is still adequately large to avoid any such prejudice. *See United States v. Jacques*, No. 08-117, 2011 WL 1706770, at * (D. Vt. May 4, 2011) ("That there are individuals with access to the Internet who are willing to post their strong opinions about the case does not provide evidence . . . that the local venue is so saturated with poisonous outpourings that [defendant] will be unable to receive a fair trial in the District of Vermont."), *vacated and remanded on other grounds*, 684 F.3d 324 (2d Cir. 2012).

**B. Nature of Coverage**

    1. Degree of Prejudice

Defendants assert that because this is a retrial, the nature of the media coverage is more prejudicial than that in *Skilling*. The Court agrees that the relative strength of any prejudicial information is relevant, but finds that it is not so strong here as to invoke a presumption of prejudice. By way of example, "a defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him." *See Parker v. Randolph*, 442 U.S. 62, 72 (1979) (plurality opinion), quoted in *Skilling v. United States*, 130 S. Ct. at 2916. But even publicity

---

[22]The Court was not provided with the total number of comments present in the binders of media coverage, nor with any sort of estimate of the approximate proportion of negative, positive, and neutral comments.

surrounding an inadmissible confession is not in itself sufficient to require a venue transfer. *See, e.g.*, *Knapp v. Leonardo*, 46 F.3d 170, 174, 176 (2d Cir. 1995) (concluding that retrial did not require venue transfer despite publicity that included coverage of confession improperly introduced at original trial).

In *Patton v. Yount*, 467 U.S. 1025 (1984), a habeas case, the Supreme Court considered the denial of a venue transfer motion in the context of both a retrial and a publicized inadmissible confession. Although prejudice related to assumptions of a defendant's culpability was at issue, the Supreme Court concluded that other factors demonstrated that the district court did not commit manifest error in declining to find a presumption of prejudice. *Id.* at 1040; *see also Wilcox*, 631 F.3d at 748 (applying *Yount* standard to Rule 21(a) motion). In contrast, there is no inadmissible confession at issue here. Indeed, Warren and McCabe have steadfastly maintained their innocence at every stage of the process.

In *United States v. Partin*, 552 F.2d 621 (1977), defendants faced a re-trial after the U.S. Court of Appeals for the Fifth Circuit vacated their convictions because of misjoinder and failure to sever. *See United States v. Marionneaux*, 514 F.2d 1244, 1248 (5th Cir. 1975). The district court denied defendants' venue transfer motion, which was largely based on publicity from the previous trials. Reviewing the district court's denial of the motion, the Fifth Circuit observed that 11 of 50 panel members thought they remembered something from the previous or pending trial, and 10 of the 11 had only the "slightest familiarity with the previous or pending cases, and no prejudice." *Partin*, 552 F.2d at 640. In such a case, the Fifth Circuit characterized a "careful voir dire" as "invaluable in gauging whether community prejudice is so great that a defendant cannot receive a fair trial in a given locale." *Id.* at 640. With respect to defendants' motions, the Court concludes that

-10-

juror questionnaires and voir dire will be similarly necessary and valuable when gauging the extent of any prejudice.

### 2. Tone

As to the content of the media coverage, the Court has reviewed the exhibits submitted by the government and defendants. Some articles focus on the sensational aspects of the case, and some editorials opine as to culpability and sentencing.[23] The majority of the content examined by the Court is factual, however, and does not demonize defendants or otherwise give rise to a presumption of unfair prejudice.[24] *See Beck v. Washington*, 369 U.S. 541, 556 (1962) (contrasting front-page items that were "straight news stories" with "invidious articles which would tend to arouse ill will and vindictiveness"). The media coverage identified by defendants is insufficient to give rise to a presumption of prejudice, whether by itself or in conjunction with other relevant factors.

### 3. Online Comments

The Court has read many of the NOLA.com comments on the post-remand articles, as well as a large number of comments on articles associated with the previous trial. A severe prejudice is not apparent from this review. While "[m]any of the comments, it must be acknowledged are unkind toward [defendants]," "prejudge [their] guilt," or "opine on what [their] punishment should be," "the comments are not uniform in the sense of expressing a community-wide fixed opinion." *United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 802 (W.D. Penn. 2010). In general, there are also many passionate advocates of defendants' innocence and Henry Glover's culpability, and also a sizeable number of comments that are neutral. The many comments reviewed by the Court do not

---

[23]*E.g.*, R. Doc. No. 676-2.
[24]*But see* R. Doc. No. 676-22.

collectively indicate that there is a well-grounded fear of encountering a pervasively prejudiced jury pool.

**III. Passage of Time**

The government asserts that publicity surrounding this case has abated with time. Defendants strongly disagree.[25]

In *Yount*, the case involving an inadmissible confession and retrial, the Supreme Court noted that "while it is true that a number of jurors and veniremen testified that at one time they had held opinions [on the case], for many, time had weakened or eliminated any conviction they had had."467 U.S. at 1083. "[T]he extensive adverse publicity and the community's sense of outrage were at their height prior to Yount's first trial in 1966." *Id.* at 1032. By the time of jury selection for the second trial, four years had passed, "prejudicial publicity was greatly diminished and community sentiment had softened. *Id.* "That time soothes and erases is a perfectly natural phenomenon, familiar to all." *Id.* at 1084.

The relevant question is "not whether the community remembered the case, but whether the jurors at [the re-trial] [will have] such fixed opinions that they could not judge impartially the guilt of the defendant[s]." *Yount*, 467 U.S. at 1035. "[I]t is clear that the passage of time between a first and a second trial can be a highly relevant fact." *Id.* Approximately two years and nine months will have passed between the first and second trials. Whether the two years and nine months at issue has less of a soothing or erasing effect than expected may be evaluated via juror questionnaires and voir dire. The passage of time generally weakens juror prejudice, and the Court has not found evidence to the contrary at this stage.

---

[25]*See* R. Doc. Nos. 676, at 4; 679, at 7.

## IV. Jury's Conduct

Given that a pre-trial motion is before the Court, evaluating jurors' verdicts as an indication of impartiality is not possible, at least not in the sense indicated by the Supreme Court in *Skilling*. Even without considering this factor, however, the Court would conclude that there is not a presumption of prejudice in this case. That said, this matter previously went to trial, as have other high-profile cases involving defendants who were law enforcement officers. *See Bowen*, 2011 WL 1979949, at *2 & n.2. These cases indicate a fair and impartial jury can be empaneled.[26] Despite the extensive media coverage surrounding defendants' first trial, which is readily available in defendants' exhibits, no one has suggested that the jury's verdicts were indicative of media prejudice.

## V. Other Factors

### A. Hurricane Katrina

The government and defendants both argue, independent of their media arguments, that the jury pool's collective experience with Hurricane Katrina and law enforcement support their positions. For example, McCabe asserts that Hurricane Katrina and an "embedded community perception that, in the wake of the storm, numerous officers of the New Orleans Police Department engaged in widespread acts of lawlessness" are "historically unique events [that have] produced prejudicial and inflammatory publicity that has so saturated the New Orleans community as to render it virtually impossible to obtain an impartial jury."[27] Warren argues that, "In short, Houston is bigger than Enron, which was but a blip on its history. New Orleans is not bigger than Katrina,

---

[26]*See also* R. Doc. No. 672, at 18-19 (discussing cases).
[27]R. Doc. No. 649-1, at 6.

which now is in the fabric of New Orleans history."[28] The government asserts that jurors who experienced Katrina are "better situated to understand the unique contours of this case and the situations presented to all who remained in the city, including police officers and civilians alike."[29]

Generalizing and anticipating the potential effects of Katrina on the jury pool in this case would require speculation not called for by the pre-trial prejudice analysis. The Court instead agrees with the government's alternative argument that while many jurors may have experienced the effects of Hurricane Katrina, "very few of these residents were victims of unjustified force or obstruction of justice by police officers following the storm."[30] Hurricane Katrina itself does not suggest or undermine a presumption of prejudice.

### B. Unrelated Publicity & *Treme*

Defendants argue that the media coverage related to *Bowen* prejudices the present, unrelated case. The Court is not convinced that a properly instructed jury will suffer from any prejudice arising from the Danziger Bridge events or the legal consequences. Similarly, to the extent the New Orleans Police Department has been the subject of a publicized consent decree, there is no showing that this will negatively impact Warren or McCabe's right to an impartial jury. Finally, defendants have not identified a link between the U.S. Department of Justice Report and their cases. *See Bowen*, 2011 WL 1979949, at *3.

Warren argues that three episodes of *Treme*, an HBO television series, "comingl[e]" the "facts and theories" behind Warren's case and that of his co-defendants, which this Court improperly refused to sever in the first trial. To the extent that such comingling exists, the government correctly

---

[28]R. Doc. No. 650-1, at 5.
[29]R. Doc. No. 672, at 1.
[30]R. Doc. No. 672, at 7.

asserts that this nationally broadcast, premium cable, television show potentially contaminates jurors everywhere. *See id.* Jurors with any prior knowledge of this case would be asked to set such knowledge aside, notwithstanding any familiarity with previous episodes of *Treme*.

### C. Alleged Government Misconduct

Warren alleges that "the government, aided by the media, has deliberately and irrevocably saturated the public with the perception of a widespread public conspiracy of corruption and abuse, inflaming public opinion and ensuring the defendant officers are publicly viewed as corrupt."[31] Among the government's tactics, Warren alleges, were "brazen" "leaks" that created a "tide of public animus leading to the jury selection."[32] Warren also alleges that the government more directly poisoned the jury pool through commenting online on various news stories.[33] To the extent that any such new evidence is unearthed, the Court will revisit today's decision if necessary.[34]

### D. Risk of Mid-Trial Publicity

Defendants and the government acknowledge the risks associated with mid-trial publicity. Evaluating the totality of the circumstances, the Court concludes that it would be premature to assume that the risks of mid-trial publicity and jurors' noncompliance with instructions relative to avoiding such publicity warrant a venue transfer at this stage.

---

[31] R. Doc. No. 650-1, at 5.
[32] *Id.* at 6.
[33] *Id.* at 15.
[34] *See* R. Doc. No. 663 (motion for discovery).

## CONCLUSION

"[P]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *Skilling*, 130 S. Ct. at 2914-15. The media coverage of defendants' cases is extensive, although not unusually so given the nature of these cases. At this stage, the evidence does not suggest that media coverage "inflamed the jury pool, pervasively prejudiced the community against the defendant[s], probatively incriminated [them], or exceeded the sensationalism inherent in the crime" with respect to either defendant. *Wilcox*, 631 F.3d at 747. Thorough, open-ended questioning via questionnaires and voir dire is sufficient to identify prejudice in the jury pool. The Court is not oblivious to the difficult path it will navigate when it attempts to question jurors as to prior knowledge without planting the seeds of such knowledge.[35] But this difficulty would be present in any venue, and to the extent that trial in the Eastern District of Louisiana presents an increased challenge, questionnaires and careful voir dire will ensure that defendants' trials are held before an impartial jury.

**IT IS ORDERED** that the motions are **DENIED** without prejudice to defendants' right to re-urge their motions following the receipt of the juror questionnaires.

New Orleans, Louisiana, April 12, 2013.

_____
LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE

---

[35]R. Doc. No. 679, at 4.